**FILED**

**NOVEMBER 2, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GARELLI WONG & ASSOCIATES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | **COMPLAINT** |
| | ) | |
| vs. | ) | No. _____  **07 C 6227** |
| | ) | |
| WILLIAM M. NICHOLS, | ) | |
| | ) | **JUDGE KOCORAS** |
| Defendant. | ) | **MAGISTRATE JUDGE VALDEZ** |
| | ) | |

## COMPLAINT

Plaintiff Garelli Wong & Associates, Inc. ("Garelli Wong") by and through its counsel, submit this Complaint for Damages and Injunctive and Other Relief against Defendant William M. Nichols ("Nichols" or "Defendant") and state as follows:

### Nature of Action

1.      This is an action for damages and injunctive and other relief, asserting claims for

(1) Breach of non-competition, non-solicitation and confidentiality provisions of contracts between Garelli Wong and Defendant; and

(2)  Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA").

### The Parties

2.      At all times mentioned, Plaintiff Garelli Wong, an Illinois corporation, was and is authorized to do business in Illinois and operates an office located in Chicago, Illinois, at 200 S. Michigan Ave Suite 1220 Chicago, IL 60604 ("Garelli Wong's Chicago office"). Garelli Wong also operates offices at Schaumburg and Oakbrook, Illinois.  Beginning in or about April 2006, MPS Group, Inc. ("MPS") purchased and became the owner of Garelli Wong and became

1

entitled to the benefit of all of Garelli Wong's existing assets, including employment agreements that Garelli Wong had with various of its employees.

3.     Defendant is an individual who resides at 5638 N. Karlov Avenue, Chicago, Illinois 60646 and is a former employee of Garelli Wong in its Jackson Wabash division . At all times mentioned, Defendant transacted substantial business in and out of Cook County, Illinois, and is now directly competing directly against Garelli Wong and soliciting its clients in violation of his contractual obligations to Garelli Wong.

**Jurisdiction And Venue**

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and its supplemental jurisdiction.

5.     Venue of this action is proper in this Court under 28 U.S.C.§ 1391(a) and (b).

**Facts Common To All Counts**

6.     Garelli Wong is a recognized leader in providing professional recruiting and executive search services for accounting and financial professionals in the Chicago, Illinois metropolitan area.  Garelli Wong's core business is providing temporary and permanent accounting and financial personnel and services to clients.  Garelli Wong personnel temporarily assigned to work for clients are referred to as its "consultants," and prospective consultants are termed "candidates."

7.     Garelli Wong's Chicago office serves clients in the Chicago, Illinois market and surrounding areas.

**Garelli Wong's Employment of Defendant And Its Protectable Business Interests**

8.     On or about December 1, 2003, Garelli Wong hired Defendant and he became a Senior Staffing Consultant working out of Garelli Wong's Chicago office.

9.     As a Senior Staffing Consultant for Garelli Wong's Chicago office, Defendant was Garelli Wong's primary and key contact with certain of its clients and prospective clients. In this capacity, Defendant developed personal relationships with, and/or confidential knowledge about, Garelli Wong's clients and employees, candidates and consultants Garelli Wong recruited,

2

and the key contacts within Garelli Wong's clients. In that capacity, he also learned those clients' preferences and needs not generally known in the industry.

10.     Garelli Wong has devoted substantial time and expense to identify clients receptive to Garelli Wong's services, identifying the key decisionmakers within those various clients, cultivating Garelli Wong's client relationships, learning the specialized needs and preferences of Garelli Wong's clients, determining how those needs match the capabilities of Garelli Wong's employees, and working out client-specific pricing and service arrangements. Garelli Wong has a near-permanent relationship with its customers based upon numerous factors including but not limited to the number of years that Garelli Wong spent in developing its clientele, the significant amount of money Garelli Wong invested in development of clientele, the significant degree of difficulty in developing clientele in a highly competitive market, the amount of personal customer contact required by its employees, including Defendant, the extent of Garelli Wong's detailed knowledge of its clientele, the length of time that the customers have been associated with Garelli Wong, and the continuity of Garelli Wong's relationships with customers.

11.     Garelli Wong has also spent substantial time and money to develop confidential information about potential candidates to serve its clients' needs and information which permits Garelli Wong to reach conclusions about which clients Garelli Wong wishes to serve and which offer the most attractive opportunities.

12.     Garelli Wong uses its Senior Staffing Consultants, such as Defendant, to maintain its direct, day-to-day contact with Garelli Wong's clients. The Senior Staffing Consultants spend most of their time in the market area building direct relationships with Garelli Wong's clients and working with Garelli Wong to meet client needs. In short, Garelli Wong's Senior Staffing Consultants are the "face" of Garelli Wong to its clients.

13.     Defendant was responsible for meeting and communicating directly with the Garelli Wong clients that he served to learn how best to serve them. Each opportunity leads to others with that client and to referrals to other clients. Once a company sees what Garelli Wong can do in this area and the cost relative to hiring its own employees, additional business results.

3

14.    Garelli Wong does not simply send in temporary employees when informed of a need. Rather, Garelli Wong pays its Senior Staffing Consultants to work to understand and anticipate client needs and how Garelli Wong can best serve those specific needs.

15.    During and as a part of his employment with Garelli Wong, Defendant thus learned very detailed information about client needs and preferences, including knowledge about clients' hiring managers. The hiring managers of the clients are typically the most important client contact for Garelli Wong.

16.    Defendant also learned about the billing arrangements into which Garelli Wong or the client is willing to enter. He became familiar, for example, with the type of billing arrangements Garelli Wong would and would not offer, what margins Garelli Wong expects from various types of clients, and the conditions under which Garelli Wong would change its regular requirements.

17.    Defendant met with clients to learn the types of issues they were encountering in the finance and accounting area, identify growth areas within their firms or companies, and identify particular jobs that may need temporary employees.

18.    In addition to developing substantial relationships and goodwill with, and confidential knowledge about, Garelli Wong's clients, Defendant learned confidential information about Garelli Wong's pool of screened consultants to serve the clients. For example, Defendant knows the rates Garelli Wong pays to its various consultants, the mark-up on those rates, and the flexibility Garelli Wong has to work with different clients on project-specific, or sometimes client-specific, placement. Defendant also knows such information as whether a particular candidate or consultant recently worked on a project that would result in that candidate being conflicted in or out of a particular job.

19.    Garelli Wong has invested substantial time and money in assisting Defendant in developing the client and candidate relationships and confidential information about them to serve the clients. Defendant's relationships with those clients and knowledge of their needs and preferences arose from his position with Garelli Wong.

4

20.     Moreover, Defendant had access to and regularly used the confidential and proprietary business information and trade secrets of Garelli Wong to further Garelli Wong's client relationships.  For example, he used Garelli Wong's trade secret client and candidate database ("the Database"), which contains certain client, candidate and consultant specific information.

21.     The Database was compiled over an extensive amount of time and at significant expense to Garelli Wong.  Garelli Wong has made significant efforts to maintain the confidentiality of such information.  The Database is housed in a secure server, all authorized users are required to enter personalized passwords to access it, and no one is permitted to use it except for serving Garelli Wong clients on behalf of Garelli Wong.

22.     The Database, together with other confidential and proprietary information, particularly as to client contact information and billing practices, is unique to Garelli Wong and gives Garelli Wong a significant competitive advantage in the marketplace.  All employees using it are required to sign a confidentiality agreement at the start of their employment.

23.     The proprietary information in Garelli Wong's Database includes Garelli Wong's candidate and client activity tracking information (including billing rates, margins, candidate identities and status, employee information, client identities and the names of client contacts, decisionmakers, and requirements).

24.     Garelli Wong does not share its trade secrets and confidential proprietary information about how it serves its clients with its competition.  It uses this information to expand client relationships and build goodwill.  Defendant's authorization to use the database was limted to Garelli Wong's business.

25.     Because Garelli Wong's Senior Staffing Consultants are its key contacts with its clients and they learn, possess and use Garelli Wong's valuable and confidential information, when a Senior Staffing Consultant leaves Garelli Wong, it takes a substantial period of time to transfer the goodwill that employee has developed with the clients, and the knowledge the employee has learned about the client, to others.  To protect Garelli Wong's legitimate business

interest during that period, and to create a level playing field, Garelli Wong seeks to restrain certain competitive activities by former Senior Staffing Consultants, as described below.

**Defendant's Agreements with Garelli Wong and through MPS**

26.     Consequently, as a condition of his hiring by and employment with Garelli Wong, Defendant was required to sign, and did sign on December 1, 2003, a Confidentiality and Non-Solicitation Agreement prohibiting him from soliciting Garelli Wong's employees and clients, and from disclosing or using Garelli Wong's trade secrets or confidential or proprietary information.

27.     A copy of Defendant's Confidentiality and Non-Solicitation Agreement dated December 1, 2003, is attached hereto as Exhibit A and incorporated by reference herein.

28.     The Confidentiality and Non-Solicitation Agreement contain narrowly tailored restrictive covenants on non-competition and non-solicitation.

29.     In paragraph 4 of his Confidentiality and Non-Solicitation Agreement, Defendant agreed that for the six (6) month period following the end of his employment with Garelli Wong, Defendant would not, for the benefit of any "Competitive Business":

> [d]irectly or indirectly perform services for or solicit (or assist other persons or entities to perform services for, or solicit) any Client for which the Employee, during the one-year period prior to the termination of the Employee's employment with the Company: 1) performed services, 2) had any direct Client or Potential client, or 3) received financial credit for any placements.

30.     In paragraph 2 of the Confidentiality and Non-Solicitation Agreement, Defendant agreed that he would not, at any time, disclose, or use for the benefit of himself or anyone other than Garelli Wong, any of Garelli Wong's trade secrets or confidential or proprietary information, including the Company's candidate database.   In paragraph 3 of the same Agreement Defendant agreed to return all Company materials immediately upon termination of employment.

31.     These covenants and prohibitions are reasonably tailored to protect Garelli Wong's legitimate business interests in the highly competitive accounting and financial staffing placement market.

6

32.     Defendant and Garelli Wong agreed that Defendant's Confidentiality and Non-Solicitation Agreement would be "governed by, and construed and enforced in accordance with, the laws of the State of Illinois."

33.     Defendant agreed that any breach of paragraphs 2, 3, 4, or 5 of the Confidentiality and Non-Solicitation Agreement would cause Garelli Wong to suffer irreparable damage for which there would be no adequate legal remedy and that, in addition to other remedies, Garelli Wong would be entitled to injunctive relief.

34.     In or about April 2006, MPS acquired ownership of Garelli Wong and Garelli Wong became part of MPS's corporate family.

35.     On or about June 27, 2006, Defendant entered into a Restricted Stock Agreement (the "RSA") with MPS. A copy the Restricted Stock Agreement between Defendant and MPS is attached hereto as Exhibit B and incorporated by reference herein. The RSA specifically provided that, for purposes of the restrictive covenants set forth therein, the term "Employer" includes subsidiaries or affiliates of MPS (see RSA section 7).

36.     In the RSA, Defendant was granted 1,500 shares of MPS Group's common stock.

37.     In exchange for the shares, Defendant agreed to certain restrictive covenants, including not to solicit employees of the Employer (RSA section 7 (a)), not to solicit clients of the Employer of the office to which he was assigned (RSA section 7(b)), and not to compete with the Employer (RSA section 7(c)) . Specifically, paragraph 7(c) of the Restricted Stock Agreement states, in part, that for a twelve (12) month period immediately following the end of Defendant's employment, Defendant:

> shall not, either directly or indirectly, either on his or her own behalf or on behalf of another business, engage in or assist others in the following activities:
>
> ***
>
> (c) Entering into, engaging in, being employed by, being connected to, consulting or rendering services for, any enterprise that is offering or performing services similar to, or in competition with, business or services offered or performed by Employer at the time of the termination of Employee's employment from the Employer. The geographic scope of the restriction stated in this Subsection 7(c) shall be limited to prohibit such activities only from or within a 50 square

mile radius of each office to which Employee was assigned or, if in management, each office or offices under Employee's managerial authority, at any time during the twelve (12) month period immediately preceding the termination of Employee's employment from the Employer. . . .

38.    The 50-mile radius running from Garelli Wong's Chicago office is the core area where the vast majority of Garelli Wong's Chicago office clients are located.    It is within this area where Garelli Wong's Chicago office conducts its business and where Garelli Wong's goodwill has been established.    This area is where Defendant's activities primarily took place for Garelli Wong and where he utilized his position and resources at Garelli Wong to develop and serve Garelli Wong's clients.

39.    In paragraph 8 of the Restricted Stock Agreement, Defendant further agreed that he would not, at any time, directly or indirectly disclose or use or any confidential or proprietary information concerning the business of the Employer.

40.    Defendant agreed that the Restricted Stock Agreement would be governed and interpreted by the laws of the state of Florida.

41.    Defendant agreed that a violation, or threatened violation, of paragraphs 7 and 8 of the Restricted Stock Agreement could not be remedied by money damages alone and that a party injured by a threatened or continuing violation would be entitled to injunctive relief.

**Defendant's Resignation and Breaches of His Agreements**

42.    On Friday, September 28, 2007, Defendant voluntarily resigned from employment with Garelli Wong.    Upon information and belief, Defendant is currently working in direct competition with Garelli Wong.

43.    Prior to his resignation from employment with Garelli Wong, Defendant compiled significant amounts of Garelli Wong's confidential and proprietary client and candidate information.    Upon information and belief, Defendant used Garelli Wong's Database to retrieve all or portions of this information and he exceeded his authorization for Garelli Wong by doing so.

8

44. Defendant attempted to send, this information to his personal e-mail account and/or copied it for his personal use.

45. Immediately following his resignation from Garelli Wong, Defendant contacted a candidate of Garelli Wong and attempted to recruit that candidate for a position on behalf of his current employer. To contact that candidate, Defendant used confidential information to which only Garelli Wong had access and which Defendant exceeded his authorization at Garelli Wong to obtain and copy.

46. In October 2007, Garelli Wong learned that Defendant had solicited and attempted to recruit a Garelli Wong candidate.

47. Garelli Wong also learned that Defendant contacted or was trying to contact one or more Garelli Wong clients to set up meetings. Garelli Wong also learned that Defendant informed at least one Garelli Wong client that he is working for a company called "Torrey and Gray".

48. Upon information and belief, Defendant is working in a capacity similar to the Senior Staffing Consultant position he held with Garelli Wong, in direct competition with Garelli Wong, and his competitive activities occurred within the scope of his agreements with Garelli Wong and MPS.

49. Defendant is using Garelli Wong's confidential and proprietary information to contact, solicit, recruit, or attempt to solicit and recruit, Garelli Wong's candidates.

50. Defendant is using Garelli Wong's confidential and proprietary information, and his relationships with Garelli Wong clients, developed during his employment with Garelli Wong, to target and solicit Garelli Wong's clients in order to compete against Garelli Wong for those clients.

51. As a result of Defendant's actions, Garelli Wong stands to suffer, and will continue to suffer, irreparable harm for which there is no adequate remedy at law. Garelli Wong's loss is presently impossible to fully quantify.

52.    Garelli Wong is threatened with the erosion and loss of clients and client relationships, loss of goodwill, and loss of Garelli Wong's confidential information - precisely what it and MPS Group contracted with Defendant to prevent.

53.    Defendant's conduct was and is willful, intentional, and not privileged.

54.    All conditions precedent to filing suit have been performed, occurred or excused.

## COUNT ONE—BREACH OF CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

55.    Plaintiffs repeat and reallege their responses set forth in paragraphs 1-54 above as if fully set forth herein.

56.    The Confidentiality and Non-Solicitation Agreement between Defendant and Garelli Wong is a valid and enforceable contract, and Garelli Wong has honored its obligations under the Agreement.

57.    Defendant has breached, is breaching, and unless enjoined, will continue to breach his obligations under the Confidentiality and Non-Solicitation Agreement.

58.    Defendant's conduct has caused and/or stands to cause Garelli Wong substantial and immediate irreparable injury, including, but not limited to, the potential loss of near-permanent client relationships, candidate relationships, goodwill, and its trade secret, confidential, and proprietary business information. Unless enjoined, Defendant will continue to breach his obligations and cause further such injury.

59.    As a result of these breaches, Garelli Wong has suffered damage in an amount that cannot presently be determined.

60.    A permanent loss of such client relationships, potential business, and/or trade secret, confidential and proprietary business information cannot be adequately remedied in an action for damages.

61.    Garelli Wong had legitimate business interests in obtaining a restrictive covenant from Defendant and has legitimate business interests in enforcing that covenant.

### COUNT TWO—BREACH OF RESTRICTED STOCK AGREEMENT

62.    Plaintiffs repeat and reallege their responses set forth in paragraphs 1–54 above as if fully set forth herein.

63.    The Restricted Stock Agreement between Defendant and MPS is a valid and enforceable contract, and MPS  has honored its obligations under the Agreement.

64.    Garelli Wong is a subsidiary or affiliate of MPS and is entitled as an "Employer" referenced therein to the benefit of Defendant's obligations under the Restricted Stock Agreement.  Garelli Wong thus is entitled to directly enforce the Defendant's obligations therein.

65.    Defendant has breached and is breaching and unless enjoined will continue to breach his obligations under the Restricted Stock Agreement.

66.    Defendant's conduct has caused and stands to cause Garelli Wong substantial and immediate irreparable injury, including, but not limited to, the potential loss of near-permanent client relationships, candidate relationships, goodwill, and its trade secret, confidential, and proprietary business information.  Unless enjoined, Defendant will continue to breach his obligations and cause further such injury.

67.    As a result of these breaches, Garelli Wong has suffered damage in an amount that cannot presently be determined.

68.    A permanent loss of clients or potential business cannot be adequately remedied in an action for damages.

69.    Legitimate business interests support the obtaining of a restrictive covenant from Defendant.

### COUNT THREE—VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT

70.    Garelli Wong repeats and realleges the allegations of paragraphs 1-54 as if fully set forth herein.

71.    Garelli Wong uses its computers in interstate commerce or communication.

72.    Defendant intentionally accessed Garelli Wong's Database without authorization and/or exceeded his authorized access, and transferred or attempted to transfer that information

outside of Garelli Wong to his own possession, thereby misappropriating and obtaining valuable confidential, proprietary and trade secret information belonging to Garelli Wong.

73.     Defendant's conduct caused losses to Garelli Wong in excess of $5,000.

74.     Defendant's conduct constitutes a violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

75.     As a result of Defendant's violations of the Computer Fraud and Abuse Act, Garelli Wong has been and will continue to be severely and irreparably damaged.

## PRAYER FOR RELIEF

WHEREFORE, as to all Counts, Garelli Wong a respectfully requests:

**I.      A preliminary and permanent injunction restraining and enjoining Defendant and those in active concert with him from:**

(i)     using, disclosing or converting in any manner or in any form any of Garelli Wong's confidential, proprietary or trade secret information;

(ii)    destroying, damaging or otherwise disposing of any of Garelli Wong's confidential, proprietary or trade secret information;

(iii)   violating any of the terms of the restrictive covenants in the Garelli Wong Confidentiality and Non-Solicitation Agreement that he signed;

(iv)    violating any of the terms of the restrictive covenants in the MPS Group Restricted Stock Agreement that he signed; and

(v)     hiding or destroying any documents or other evidence in any way concerning the allegations in this Complaint.

**II.     The following other relief:**

(i)     Compensatory and exemplary damages;

(ii)    An accounting of any gain received, directly or indirectly, by Defendant by virtue of wrongful acts as described herein;

(iii)   A constructive trust for the benefit of Garelli Wong over all advantages of any type received by Defendant by virtue of wrongful acts described herein;

(iv)    Attorneys' fees and costs; and

(v)      Such other and further relief as this Court may deem proper.

Dated November 2, 2007.

Respectfully submitted,

**GARELLI WONG & ASSOCIATES, INC.**

By:  /s/ David N. Michael
**DAVID N. MICHAEL** (ARDC # 6216553)
**GOULD & RATNER LLP**
222 North LaSalle Street
Suite 800
Chicago, Illinois 60601
P:  312.236.3003
F:  312.236.3241

**Attorney for Plaintiffs**

13

# EXHIBIT A

## CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

This Agreement is entered into as of _Dec 1_____, 20_03_, between Garelli Wong & Associates, (the "Company"), and _Morgan Nichols_____ (the "Employee").

WHEREAS, the Employee and the Company desire to establish an employment relationship in which the Employee will have access to confidential business information and an opportunity to develop relationships with actual or potential clients of the Company; an

WHEREAS, the Company will establish, or continue, such an employment relationship and provide such access and opportunity to the Employee only on the condition that the Employee enters into this Agreement.

NOW, THEREFORE in consideration of the obligations, promises and covenants contained in this Agreement, and other good and valuable consideration, the parties hereto agree to the following terms and conditions:

    1.    <u>Definitions</u>. For the purposes of this Agreement:

        A.    The term "Client" is defined as any person, corporation or other entity which has requested the Company, orally or in writing, to perform services.

        B.    The term "Potential Client" is defined as any person, corporation or other entity with which any employee of the Company has held discussions regarding the possibility of rendering services, or to which an employee has made any oral or written proposal for the performance of services by the Company.

        C.    The term "Competitive Business" is defined as any business endeavor other than the Company, including but not limited to, any self-owned business or self-employment of the Employee, which provides recruitment or placement services, or other services of any type or character which the Company may provide from time to time during the Employee's period of employment.

    2.    <u>Non-Disclosure and Nonuse of Confidential Information.</u>  Except as permitted by this Agreement or with the written consent of the Company, the Employee shall not at any time during or after employment with the Company, divulge, disclose or communicate, directly or indirectly, to any person, corporation or other entity, or use for his/her own benefit or for the benefit of anyone other than the Company, any of the Company's trade secrets or confidential or proprietary information, including, but not limited to, Client or Potential Client identities and contacts; Client or Potential Client lists; Client or Potential Client financial, business or personal information; other information relating to Client or Potential Client accounts, feedback or directions; financial and business information relating to the Company and its transactions; and any other confidential information relating to the Company, its business, or its Clients or Potential Clients, including the Company's candidate database.

Employee agrees that all confidential and proprietary information shall belong to and be the sole and exclusive property of the Company.

3.   <u>Return of Proprietary Materials.</u>  Immediately upon termination of employment with the Company, the Employee shall return to the Company all materials that relate to the Company, its business, its Clients or Potential Clients which came into the Employee's possession during the Employee's employment by the Company.

4.   <u>Non-Solicitation of Clients.</u>  During the six-month period following the last day of the Employee's employment by the Company, the Employee shall not, for the benefit of a Competitive Business, directly or indirectly perform services for or solicit (or assist other persons or entities to perform services for, or solicit) any Client for which the Employee, during the one-year period prior to the termination of the Employee's employment with the Company: 1) performed services, 2) had any direct Client or Potential client, or 3) received financial credit for any placements.

5.   <u>Non-Solicitation of Employees.</u>  During the six-month period after the termination of the Employee's employment at the Company, the Employee shall not directly or indirectly recruit, solicit, hire, or recommend the hiring of, any person who was employed by the Company at any time during the one-month period prior to the Employee's termination; provided, however, that the Employee may recruit, solicit or hire any employee of the Company who was involuntarily terminated by the Company.

6.   <u>Application of Restrictions.</u>  The provisions of Paragraphs 2 through 5 of this Agreement shall apply regardless of whether the Employee's employment with the Company is terminated voluntarily or involuntarily.

7.   <u>Abatement of Period of Restriction In Case of Breach.</u>  In the event of any breach or violation of the restrictions contained in Paragraphs 2 through 5 of this Agreement, the specified time period for observance of those restrictions shall abate during the time of any such breach or violation, and such time period remaining at the time of the breach shall not begin to run again until the breach has been fully and finally cured.

8.   <u>Severability.</u>  In the event that any provisions of this Agreement are found or held to be invalid or unenforceable, the remaining provisions of the Agreement shall nevertheless continue to be valid and enforceable as though the invalid and unenforceable parts had not been included herein and such determination shall not bar or affect the Company's right to obtain relief based on the remaining provisions of this Agreement.  Each provision of this Agreement, for this purpose, is severable and independent of every other provision.

Further, the restrictions contained in Paragraphs 2 through 5 of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  If any provision of this Agreement shall be adjudicated to be invalid, over broad or unenforceable, the parties agree that the court making such determination shall have the power to delete, amend and/or reduce the duration and/or scope of, the provision thus adjudicated to be invalid or unenforceable to the extent necessary for said provision to be adjudicated valid and enforceable, such deletion and/or reduction to apply only with respect to the operation of this Agreement in the particular jurisdiction in which such adjudication is made.

9.    Injunctive Relief.  The parties recognize that, in the event the Employee breaches any of the provisions of Paragraphs 2 through 5, the Company will suffer irreparable damage for which the Company has no adequate remedy at law.  Therefore, in the event of a breach of this Agreement, the parties hereto agree that, in addition to any other remedies that may be available to the Company at law or equity, the Company shall be entitled to injunctive relief and that the Company shall not be required to post bond or other security.

10.    Costs and Attorneys' Fees.  In the event the Company commences any action, suit or other proceeding and the trial court determines that the Employee breached any term of this Agreement, in addition to any other relief to which the Company may be entitled, the Employee shall promptly pay all expenses (including reasonable attorneys' fees) of the Company in such action, suit or other proceeding.

11.    Applicable Law.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Illinois.  The Employee and the Company agree to submit to the jurisdiction in any state or federal court located in Cook County, Illinois and agree not to challenge the venue, personal or subject matter jurisdiction of any such court.

12.    Entire Agreement.  This Agreement constitutes the complete agreement between the parties concerning the matters referred to herein.  The parties acknowledge that no statement, promise or representation has induced them to sign this Agreement other than those contained herein. No amendment or modification of this Agreement shall be effective unless it is in writing and signed by the Employee and the President of the Company.

13.    Headings.  The headings contained in this Agreement are inserted for convenience only and are not to be considered in construction of the provisions herein.

14.    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of, and shall be enforceable by and against the Company and its successors and assigns, and the Employee and his heirs, beneficiaries and legal representatives.  It is agreed that the Employee may not delegate or assign his rights and obligations under this Agreement.

EMPLOYEE,

By: _____

Printed Name: _Morgan Nichols_

Date: _12/1/03_

GARELLI WONG & ASSOCIATES

By: _____

Title: _Vice President_

Date: _12/1/03_

# EXHIBIT B

## RESTRICTED STOCK AGREEMENT

This Restricted Stock Award Agreement (the "Agreement") is made effective as of March 7, 2006 (the "Effective Date") between Morgan Nichols (the "Employee") and MPS Group, Inc., a Florida corporation (the "Company").

### WITNESSETH THAT:

WHEREAS, the Company has awarded to Employee 1,500 shares (the "Shares") of the Company's common stock, $.01 par value per share (the "Stock"), effective as of the Effective Date, pursuant to the 2004 Equity Incentive Plan (the "Plan"), as a reward for prior service and as an incentive to remain with the Company or its subsidiaries or affiliates and to work to increase the value of the Stock; and

WHEREAS, the Shares are subject to the terms and conditions hereinafter provided;

NOW, THEREFORE, the Company and the Employee agree to the foregoing and as follows:

1.      AWARD. The Employee hereby is granted 1,500 Shares as of the Effective Date subject to all the terms and conditions of this Agreement.

2.      STOCK CERTIFICATE; UNCERTIFICATED STOCK.

        (a)     The Company may in its discretion issue one or more stock certificates (the "Certificate(s)") in the name of the Employee for the Shares which Employee hereby acknowledges and agrees would be subject to and bear the following legend:

                "The transferability of this certificate and the shares of stock represented hereby are subject to the terms and conditions (including forfeiture) of a Restricted Stock Agreement entered into between the registered owner and MPS Group, Inc., effective as of March 7, 2006. Copies of such Agreement are on file in the offices of the Secretary, MPS Group, Inc., 1 Independent Drive, Jacksonville, Florida 32202."

        The Employee shall forfeit and/or return the Certificate(s) to the Company upon the forfeiture of any Shares, pursuant to this Agreement. Thereafter, the Company shall reissue Stock pursuant to Section 2(c) of this Agreement for the number of Shares, if any, which were not forfeited. The new Shares, if any, and the Stock represented thereby, shall remain subject to this Agreement.

        (b)     The Company may in its discretion issue in the name of the Employee the Shares in an uncertificated form as properly recorded in the books and records of the Company, including its stock transfer book, which Shares Employee hereby acknowledges and agrees would be subject to the same restrictions and limitations on transferability (including forfeiture) as are set forth for the Certificate(s) in Section 2(a) of this Agreement.

        (c)     In the event that Shares are forfeited pursuant this Agreement, (i) if a Certificate has been issued pursuant to Section 2(a) hereof, the Company shall reissue a Certificate pursuant to Section 2(a) of this Agreement for the number of Shares, if any, which were not forfeited, and (ii) if no Certificate has been issued and the Shares are uncertificated in accordance with Section 2(b) hereof, then the forfeiture of the Shares shall be recorded in the books and records of the Company, including its stock transfer book. Notwithstanding the foregoing, all unforfeited Shares held by Employee pursuant to this Agreement shall remain subject to the terms of this Agreement and the Plan.

Rev. 03/05 staffield
Copyright © 2005 MPS Group, Inc. All rights reserved.

3.　　VESTING OF SHARES. The Employee agrees the Shares shall vest on the date and in the amount as follows:

| Vesting Date | Number of Shares Vested |
|---|---|
| March 7, 2008 | 1,500 |

(a)　If the Employee shall cease to be employed by the Company, or any affiliate or subsidiary thereof such that Employee is no longer employed in any capacity with the group of companies affiliated with the Company, at any time prior to the Vesting Date set forth above, then the Employee shall forfeit and return to the Company any Shares which remain unvested as of such date for no payment.

(b)　No Shares hereunder shall be sold, exchanged, transferred, pledged, hypothecated or otherwise disposed of by Employee unless and until vested pursuant to this Section 3 above.

4.　　VOTING RIGHTS; DIVIDENDS; CAPITAL CHANGES.

(a)　Except as otherwise limited or provided in this Agreement, with respect to any Shares subject to the restrictions of this Agreement, the Employee shall be a shareholder of the Company and (i) shall have all of the rights of a shareholder with respect to the Shares, including full power to vote all of the Shares from time to time, and (ii) shall be entitled to receive dividends and/or distributions declared on such Shares.

(b)　Any new, additional or different shares of capital stock or other securities issued with respect to any of the Shares described herein or in substitution or replacement thereof shall be subject to all of the terms and conditions of this Agreement and shall be delivered to the Employee (or the Employee's beneficiary) or revert to the Company under the same circumstances as the original Shares with respect to, or in substitution for which, they were issued.

5.　　DELIVERY OF SHARES.

(a)　If Employee refuses to deliver to Company a properly endorsed stock certificate for any Shares forfeited, the Employee hereby authorizes and directs the Company to cancel on its books and records (including but not limited to its stock transfer book) the Employee's ownership of the Shares and to take whatever action the Company deems necessary or appropriate to have such Shares registered in the name of the Company without any further action, or direction, by the Employee. The Company shall have similar rights to cancel on its books and records (including but not limited to its stock transfer book) the Employee's ownership of any Shares in an uncertificated form and to take whatever action the Company deems necessary or appropriate to have such Shares registered in the name of the Company without any further action, or direction, by the Employee.

(b)　The Company may in its discretion require the execution and delivery by the Employee of blank stock powers, an escrow agreement, and related schedules and exhibits, as a condition of issuance or delivery of, or removal of restrictions from, the Shares or Certificate(s).

(c)　The Company may in its discretion require that Employee pay, or evidence to the Company's satisfaction arrangement for the payment of, Federal, state or local taxes associated with the award or vesting of the Shares, as a condition of issuance or delivery of, or removal of restrictions from, the Shares or Certificate(s).

6.　　COMPLIANCE WITH LAW AND REGULATIONS; INCORPORATION OF PLAN. The obligations of the Company hereunder are subject to all applicable Federal and state laws and to the rules, regulations and other requirements of the Securities and Exchange Commission, any stock exchange upon which the Shares are then listed and any other government or regulatory agency. This Agreement is expressly made subject to the terms of the Plan,

the terms and conditions of which are expressly incorporated herein by reference. The Employee hereby acknowledges receipt of a copy of the Plan and agrees to be bound by all the terms and provisions thereof.

7.    RESTRICTIVE COVENANTS. In consideration of being offered the Award herein, Employee hereby agrees that during his or her employment with the Company, or one or more of its subsidiaries or affiliates as the case may be (each hereinafter an "Employer"), and for the period of twelve (12) months immediately following the termination of Employee's employment such that Employee is no longer employed in any capacity with the group of companies affiliated with the Company, whatever the reason for the termination of Employee's employment, Employee shall not, either directly or indirectly, either on his or her own behalf or on behalf of another business, engage in or assist others in the following activities:

(a)    Soliciting, hiring, recruiting or attempting to recruit any person employed by the Employer, with whom Employee had contact while each were employed with the Employer, to divert employment or personal services away from the Employer or to or in favor of Employee or any other person or party other than the Employer;

(b)    Soliciting to perform, or performing or agreeing to perform, for or on behalf of any enterprise that is similar to or competes with the Employer, any business or services for a client of Employer solicited or performed by Employee, or solicited or performed by the office or offices to which Employee was assigned (or, if in management, the office or offices under Employee's managerial authority), at any time during the twelve (12) month period immediately preceding the termination of Employee's employment from the Employer; or

(c)    Entering into, engaging in, being employed by, being connected to, consulting or rendering services for, any enterprise that is offering or performing services similar to, or in competition with, business or services offered or performed by Employer at the time of the termination of Employee's employment from the Employer. The geographic scope of the restriction stated in this Subsection 7(c) shall be limited to prohibit such activities only from or within a 50 square mile radius of each office to which Employee was assigned or, if in management, each office or offices under Employee's managerial authority, at any time during the twelve (12) month period immediately preceding the termination of Employee's employment from the Employer. This Subsection 7 (c) shall not restrict Employee from beneficial ownership of an interest of less than five percent (5%) of the outstanding shares or other securities of a company traded on a recognized national or international stock exchange.

8.    CONFIDENTIAL AND PROPRIETARY INFORMATION. Employee will not at any time, during or after the term of this Agreement, in any fashion, form or manner, either directly or indirectly, divulge, disclose, use or communicate to any person, firm or corporation, in any manner whatsoever, other than in the legitimate and authorized furtherance of the Employer's interests, any confidential or proprietary information of any kind, nature or description concerning any matters affecting or relating to the business of the Employer, including, but not limited to, the names or identities of any customers, employees or candidates, customer or candidate lists or descriptions, customer or candidate directories or contact information, billing or pricing information, pay or wage rates, commission or bonus amounts or rates, financial reports, billable headcount reports or figures, customer order or requirements, proposal forms or materials, or contracts or sales forms. Employee acknowledges and agrees that the foregoing information comprises sensitive and valuable competitive information which was developed and is maintained by Employer at great cost and effort, and which derives value from being confidential or proprietary to Employer, and that the disclosure or misuse of such information in violation of this provision would result in significant injury to Employer, its employees and shareholders. The sole exception to this Section 8 is that Employee may disclose such confidential or proprietary information only to the extent as required by law or legal process (and, if the Employee is so required to disclose, Employee shall provide Employer advance notice of such as to reasonably allow the Company or Employer the opportunity to contest or limit such disclosure at Employer's cost), and Employee shall otherwise continue to refrain from any use or disclosure of such information as if such disclosure under law or legal process had not occurred.

9.    ATTORNEYS' FEES. The prevailing party in any litigation hereunder shall be entitled to attorneys' fees and costs of litigation.

10.    NO RIGHTS TO EMPLOYMENT. Nothing in this Agreement shall confer upon the Employee any right to continue in the employ of the Company, its affiliates or subsidiaries, or interfere in any way with the right of the Company, its affiliates or subsidiaries, to terminate Employee's employment at any time.

11.    GOVERNING LAW. The terms of this Agreement shall be governed by and interpreted in accordance with the laws of the State of Florida, without regard to any issues of conflicts of laws.

12.    MISCELLANEOUS.

(a)    This Agreement shall be binding upon the parties hereto and their representatives, successors and assigns.

(b)    Any requests or notices to be given hereunder shall be deemed given, and any elections or exercises to be made or accomplished shall be deemed made or accomplished, upon actual delivery thereof to the designated recipient, or five (5) days after deposit thereof in the United States mail, registered, return receipt requested and postage prepaid, addressed, if to Employee, at the last known address set forth in the Company's personnel records and, if to the Company, to the Law Department of the Company at the executive offices of the Company at 1 Independent Drive, Jacksonville, FL 32202.

(c)    This Agreement may not be modified or waived except in writing executed by each of the parties hereto.

(d)    Should any provision of this Agreement be held by a court of competent jurisdiction to be unenforceable or invalid for any reason, such provision shall be reformed or enforced to the extent such may be rendered enforceable or valid, and in any event the remaining provisions of this Agreement shall not be affected thereby and shall continue in full force and effect in accordance with their own terms.

(e)    The parties agree that a violation or threatened violation of the terms of Section 7 and Section 8 of this Agreement would result in injury not capable of being readily or fully redressed by monetary damages alone, and that in addition to any other remedy available, the injured party shall be entitled to immediate injunctive relief to prevent or cease any threatened or continuing violation or harm, without necessity of prior notice or a bond.

(f)    This Award is conditioned on the Employee's execution and delivery of this Agreement. If this Agreement is not executed and delivered by the Employee, it may be canceled by the Company.

IN WITNESS WHEREOF, the Employee and Company have executed the Agreement effective as of the day and year first above written.

MPS GROUP, INC.:

By: _____
Its:   Tyra H. Tutor

EMPLOYEE:

_____   6/27/06
Morgan Nichols

-4-