UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GARELLI WONG & ASSOCIATES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | 07 C 6227 |
| ) | |
| WILLIAM M. NICHOLS, ) | |
| ) | |
| Defendant. ) | |

## MOTION TO DISMISS PURSUANT TO 12(b)(1) AND (6)

Pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6), Defendant respectfully moves this Honorable Court to dismiss Count III of Plaintiff's Complaint pursuant to Rule 12(b)(6) and dismiss Counts I and II pursuant to Federal Rule of Civil Procedure 12(b)(1). In support of his motion, Defendant states as follows:

1.  Both Plaintiff and Defendant are Illinois residents (Complaint at ¶ 1-2), and Counts I and II purport to allege Illinois common law claims for breach of contract arising out of the Defendant's employment with the Plaintiff. (*Id.* at ¶ 55-69).

2.  In Count III of its Complaint, Plaintiff purports to allege a claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("the Act"). The subject matter jurisdiction of this Court is premised entirely upon this Count.

3.  A civil action pursuant to the Act "may be brought *only if* the conduct involves 1 of the factors set froth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)." (*Emphasis added*). 18 U.S.C. § 1030(g). While Plaintiff does not specifically identify which clause of subsection (a)(5)(B) it purports to base its claims upon, Plaintiff appears to be attempting to invoke subsection (a)(5)(B)(i), which proscribes, in relevant part, "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, *causes damage*" and

"*loss* to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value." (*Emphasis added*). *Id.* at 5(a)(iii) and 5(b)(i). *See also* Complaint at ¶ 72-73.

    4.    Pursuant to Section (e)(8) of the Act, "damage" means "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. 1030(e)(8). Consistent with this, the Act defines the term "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

    5.    Unlike in <u>Airport Centers, L.L.C. v. Citrin</u>, 440 F.3d 418 (7th Cir. 2006) and <u>Forge Industrial Staffing, Inc. v. Fuente</u>, No. 06 C 3848 (N.D.Ill. 10/16/06), there is no allegation here that the Defendant deleted or otherwise destroyed any computer files or software. Rather, Plaintiff only alleges the following:

> 43.    Prior to his resignation from employment with Garelli Wong, Defendant compiled significant amounts of Garelli Wong's confidential and proprietary client and candidate information. Upon information and belief, Defendant used GarelliWong's Database to retrieve all or portions of this information and he exceeded his authorization for Garelli Wong by doing so.
>
> 44.    Defendant attempted to send this information to his personal e-mail account and/or copied it for his personal use.

Complaint at ¶ 43-44. See also *Id.* at ¶ 70-75.

    6.    The foregoing allegations are insufficient to meet the requirements of "damage or loss" within the meaning of the Act. As the court ruled in <u>Worldspan v. Orbitz, LLC</u>, No. 05 C 5386 (N.D. Ill. 4/19/06):

> The term "damage" is defined by the CFAA as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). The CFAA does not define "integrity," but the dictionary definition

> is "an unimpaired or unmarred condition: entire correspondence with an original condition: SOUNDNESS." Webster's Third New International Dictionary 1174 (1971). The use of the word "integrity" "contemplates, in [CFAA] context, some diminution in the completeness or useability of data or information on a computer system." Resdev, LLC v. Lot Builders Ass'n, No. 6:04-CV-1374ORL31DAB, 2005 WL 1924743, at *5 n. 3 (M.D. Fla. Aug. 10, 2005). Given these definitions of "damage" and "integrity," we reject Worldspan's argument that the mere "taking of information" constitutes "damage" under the CFAA. Orbitz correctly asserts that the complaint merely parrots the "causing damage" text of the CFAA in conclusory fashion and fails to allege any facts indicating that the completeness, useability, or availability of Worldspan's data was impaired. The conduct that is alleged is the mere "access" of Worldspan's computer system. One cannot draw the reasonable inference from this allegation that the integrity or availability of Worldspan's data was impaired....

Id. at 11-12. Copy attached hereto as Exhibit 1.

7. In the present case, Count III alleges nothing more than the possible copying of data. Plaintiff does not allege, and cannot allege, that the Defendant destroyed or erased files or data. Accordingly, Plaintiff has not alleged the requisite damage or loss required to state a claim pursuant to the Act.

8. Since Count III is insufficient to state a cause of action under the Act and no other basis for federal subject matter jurisdiction exists, Counts I and II of Plaintiff's Complaint should be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

9. In this circuit, "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on their merits." Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 727 (7th Cir. 1998).

WHEREFORE, for all of the reasons set forth herein, Defendant respectfully requests this Honorable Court to dismiss Count III of Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and dismiss Counts I and II of Plaintiff's Complaint pursuant to

Federal Rule of Civil Procedure 12(b)(1).

Dated: November 26, 2007

                                              Respectfully submitted,

                                              /s Daniel P. Hogan

Daniel P. Hogan  
Attorney No. 6182808  
McCabe & Hogan, P.C.  
19 S. Bothwell Street, Suite 200  
Palatine, IL 60067  
Telephone:    847-359-6100  
Facsimile:     847-359-6105  
E-mail:        dhogan@mccabehogan.com

## CERTIFICATE OF SERVICE

I, Daniel P. Hogan, an attorney, certify that service of Defendant's Motion to Dismiss Pursuant to 12(b)(1) AND (6) on Plaintiffs' counsel was accomplished pursuant to ECF.

s/ Daniel P. Hogan
Daniel P. Hogan

# EXHIBIT 1

# Loislaw Federal District Court Opinions

WORLDSPAN v. ORBITZ, LLC, (N.D.Ill. 2006)

WORLDSPAN, L.P., Plaintiff, v. ORBITZ, LLC, Defendant.

No. 05 C 5386.

United States District Court, N.D. Illinois, Eastern Division.

April 19, 2006

## MEMORANDUM OPINION

JOHN GRADY, District Judge

Before the court is defendant's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, the motion is granted.

## BACKGROUND

In this action, plaintiff Worldspan, L.P. ("Worldspan") alleges that defendant Orbitz, LLC ("Orbitz") violated the Consumer Fraud and Abuse Act and breached the contract between the parties. The complaint alleges the following facts, which are taken as true for purposes of the instant motion.

Worldspan is a company that gathers and maintains worldwide electronic travel data and provides travel agencies, travel service providers, and corporations with access to this data. Worldspan provides its customers with real-time access to schedules, fares, availability, and other travel data as well as the ability to process reservations and issue tickets for the products and

Page 2

services of travel suppliers such as airlines, hotels, car-rental companies, tour companies, and cruise lines. In the travel industry, Worldspan is referred to as a "computer reservations system," or CRS. As a CRS, its primary source of revenue is "segment fees," which are fees that an airline or other travel supplier pays to a CRS for each flight (or equivalent travel service) that is booked through the CRS. Worldspan passes a portion of the segment fees along to its travel agency customers in order to induce those agencies to use Worldspan's services.

### The Creation of Orbitz and Its Agreement with Worldspan

Orbitz is an online travel agency that was created and developed in late 1999 and early 2000 pursuant to a partnership among five airlines: American, Continental, Delta, Northwest, and United. In order for Orbitz to launch and operate its Web site, Orbitz signed agreements with several companies, including Worldspan, to provide necessary information and infrastructure.

In August 2000, Worldspan and Orbitz entered into an "Agreement for CRS Access and Related Services" (the "Agreement"). Pursuant to the Agreement, in exchange for Orbitz's payment of a certain

percentage of flight segments booked through any CRS, Worldspan agreed to provide Orbitz with (1) information about the availability of airline segments; (2) the capability to book and issue airline tickets; and (3) a shopping engine that would display
Page 3
to Orbitz's users a comparison of available flight routing options and pricing for international itineraries.

Also in furtherance of the launch of Orbitz's Web site, Orbitz and Worldspan in 2000 each individually entered into contracts with ITA Software, Inc. ("ITA"). Pursuant to its agreement with ITA, Orbitz paid ITA a fee for ITA to provide a shopping engine that would display to Orbitz's users a comparison of available flight routing options and pricing for domestic itineraries. Pursuant to its agreement with Worldspan, ITA in turn paid a fee to Worldspan to obtain availability and other data for Orbitz and other ITA customers.

### Orbitz's Development of the "Direct Connect" Model and the Renegotiated, Amended Agreement with Worldspan

Although Orbitz initially contracted with Worldspan for the use of Worldspan's services, its business model involves a reduction of dependence on CRSs. According to the complaint, one of the primary purposes of Orbitz is to allow bookings to be made directly with certain airlines without the involvement of a CRS (such as Worldspan). These non-CRS bookings are part of Orbitz's "direct-connect" business model; the goal under this model is to obtain the data traditionally provided by a CRS through other means and then book airline tickets through direct connections to the airlines rather than through a CRS. The direct-connect model is "significant" to Worldspan because "when Orbitz books a [flight]
Page 4
segment directly with an airline, Worldspan does not receive any revenue whatsoever from the airline." (Complaint ¶ 17.)[fn1]

Shortly before the summer of 2001, Orbitz indicated its intent to proceed with its plans to implement the direct-connect model, and it began renegotiating its agreement with Worldspan — specifically, the terms under which Orbitz could use Worldspan's data in connection with the direct-connect bookings. Worldspan states that prior to and during the renegotiation process, it "made clear to Orbitz that [Orbitz] was not authorized to use Worldspan's availability data in connection with Direct Connect segments until the parties had negotiated appropriate compensation to Worldspan for such use." (Id. ¶ 29.)

In November 2001, Worldspan and Orbitz executed an "Amended and Restated Agreement for CRS Access and Related Services" (the "Amended Agreement"). The parties were not able to reach agreement on all terms. Section 4.4 of the Amended Agreement provided: "ITA Subscription Fee. The parties agree to use their diligent best efforts to reach a definitive agreement by December 31, 2001 whereby Orbitz shall pay Worldspan a subscription fee in exchange for access to Worldspan's availability information on air carrier seat inventory." (Complaint, Ex. A, at 9.)
Page 5

During 2002, Worldspan continued to attempt to resolve "the manner in which Orbitz would be permitted to use Worldspan's availability data." (Complaint ¶ 31.) In the meantime, Orbitz moved forward with its direct-connect program. American was the first airline to become a direct-connect customer of Orbitz, in August 2002. Worldspan alleges that even though it had previously "warned" Orbitz that Orbitz could not use Worldspan's data in connection with direct-connect segments, and it had "informed" ITA that ITA could not use this data on behalf of Orbitz in connection with these segments, Orbitz "stole" this availability data for the American direct-connect flights and failed to compensate Worldspan for the data.

### The First Amendment to the Amended Agreement

"In August 2002, when Worldspan learned that Orbitz was improperly using Worldspan's availability data in connection with the Direct Connect program, Worldspan informed Orbitz that its access to the Worldspan system would be terminated unless Orbitz's improper conduct ceased." (Id. ¶ 41.) This notice led to further negotiations between the parties regarding Orbitz's use of the availability data. The result was the "First Amendment" to the Amended Agreement. In Worldspan's view, the First Amendment altered the Amended Agreement "in at least three significant ways." (Id. ¶ 48.) First, Orbitz agreed to book all of its "Airline Non-Direct
Page 6
Connect Segments" through Worldspan.[fn2] (Complaint, Ex. B, § 4(a).) Second, Orbitz agreed to not "directly or indirectly acquire or use any products or services from a CRS other than Worldspan to support or use with the Orbitz Website for Airline Direct Connect Customers." (Orbitz's Memorandum in Support of Motion to Dismiss, Ex. A, First Amendment, § 4(c).) Third, the First Amendment provided that "Orbitz shall not use the Worldspan System to search for fares, rates, schedules or itineraries that involve Airline Direct Connect Segments," and required Orbitz to "discontinue all access, either directly or through ITA, to the Worldspan System" with respect to Airline Direct Connect Segments for a particular airline within ninety days of that airline becoming a participant in the Direct Connect program. (Id., §§ 4(c)(vii) & 6(a).) The First Amendment further provided that in the event Orbitz (or ITA on behalf of Orbitz) continued to access Worldspan's availability data after the end of that ninety-day period, Orbitz would be required to pay Worldspan a "monthly processing fee" as specified in a schedule to the First Amendment.
Page 7

### The Alleged "Misconduct"

The complaint alleges that, since the execution of the First Amendment, "Orbitz has repeatedly stolen Worldspan's data and violated the [Amended Agreement] and First Amendment." (Complaint ¶ 58.) First, beginning in January 2004 and continuing through at least part of February 2004, Orbitz obtained "Power Shopper" data from Worldspan when it was not authorized to do so by issuing repeated data queries during overnight periods. Second, Orbitz sent "far in excess" of the 500 queries per day it was permitted to send to Worldspan regarding airline taxes and surcharges. Third, Orbitz improperly used Worldspan's seatmap data for

direct-connect flights. Worldspan also alleges that Orbitz used Galileo, a CRS, as well as ITA, which in Worldspan's view has now become a CRS, in violation of the First Amendment.

Worldspan filed the complaint in this action on September 19, 2005. Count I is a claim for violation of the Consumer Fraud and Abuse Act, **18 U.S.C. § 1030**(a)(5)(A)(iii). Counts II-IV are claims for breach of contract. In Count V, Worldspan seeks to enjoin Orbitz from accessing Worldspan's seatmap data and from using ITA and Galileo.

Orbitz now moves to dismiss the complaint. Also pending is Worldspan's motion to transfer and consolidate.
Page 8

## DISCUSSION

### A. Orbitz's Motion to Dismiss

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 354 (3d ed. 2004). When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Hentosh v. Herman M. Finch Univ. of Health Sciences, **167 F.3d 1170, 1173** (7th Cir. 1999). Dismissal is appropriate only if "`it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Ledford v. Sullivan, **105 F.3d 354, 356** (7th Cir. 1997).

Worldspan's only federal claim is for violation of the Computer Fraud and Abuse Act (the "CFAA"), **18 U.S.C. § 1030**. Worldspan alleges that Orbitz violated § 1030(a)(5)(A)(iii), which prohibits the intentional access of a protected computer**[fn3]** "without authorization" and thereby "caus[ing] damage." The CFAA is a criminal statute, but it permits a civil action by "[a]ny person who suffers damage or loss" from conduct prohibited by the statute if the plaintiff can satisfy one of five factors. 18 U.S.C. §
Page 9
1030(g). The factor relevant to Worldspan's claim is whether defendant's conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." **18 U.S.C. § 1030**(a)(5)(B)(i).

Orbitz's first argument for dismissal of Count I is that the documents attached to Worldspan's complaint contradict Worldspan's allegation that Orbitz accessed Worldspan's computers "without authorization," as required by § 1030(a)(5)(A)(iii). The Amended Agreement and its amendments are attached to Worldspan's complaint and thus considered part of the pleadings.

The Amended Agreement states: "During the Term of this Agreement, WORLDSPAN will provide Orbitz . . . with access to the WORLDSPAN System for purposes of the operation of the Orbitz Website and in accordance with the provisions of this Agreement." (Complaint, Ex. A, at 2.) In its response to Orbitz's motion,

Worldspan concedes that "Orbitz was permitted access to Worldspan's computer and the use of information found there for some purposes, but Orbitz exceeded the permitted access and misused the seat map data." Worldspan argues that it nevertheless has stated a claim for violation of the CFAA because, in its view, accessing a computer "without authorization" includes "exceeding the degree of permissible access." (Worldspan's Mem. in Opposition to Motion at 4.)
Page 10

As the Seventh Circuit has noted, see International Airport Centers, L.L.C. v. Citrin, 440 F.3d 418, 420 (7th Cir. 2006), the CFAA explicitly distinguishes between the act of accessing a computer "without authorization" and the act of "exceeding authorized access." The CFAA provides a definition for the latter phrase. To "exceed authorized access" is "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

In the complaint, Worldspan alleges that Orbitz accessed its computers "without authorization" in violation of § 1030(a)(5)(A)(iii). As noted above, § 1030(a)(5)(A)(iii) addresses the intentional access of a protected computer solely "without authorization" and not in excess of authorized access. In other words, that subsection does not prohibit "exceeding authorized access." It is significant that the language of § 1030(a)(5)(A)(iii) contrasts with that of other subsections of the statute, which target both types of access.

Worldspan argues that case law supports its position that "unauthorized access" includes "exceeding authorized access." The cases Worldspan cites in support of its argument, however, do not stand for that proposition. They involved alleged violations of other subsections of the statute, which do prohibit "exceed[ing] authorized access," in contrast to the subsection involved here.
Page 11

In any event, even assuming those decisions support Worldspan's construction of the statute, we are disinclined to follow them because such an interpretation of the phrase "without authorization" would ignore the carefully-drawn statutory distinction between wholly unauthorized access and access beyond that which is authorized.

We agree with Orbitz that the allegation that Orbitz accessed Worldspan's computers "without authorization" is belied by the Agreement, which permits Orbitz to access Worldspan's computers. "It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." Northern Ind. Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 454 (7th Cir. 1998) (citing, inter alia, Bell v. Lane, 657 F. Supp. 815, 817 (N.D. Ill. 1987) (stating that where exhibits attached to a complaint negate its allegations, a court is not required to credit the unsupported allegations)). Moreover, it is clear from the language of the CFAA that accessing a computer "without authorization" does not include "exceed[ing] authorized access." Because Worldspan has not adequately alleged that Orbitz accessed its computers "without authorization," Count I must be dismissed.

   An alternative ground for dismissal is Worldspan's failure to allege that Orbitz's conduct caused damage, as required by § 1030(a)(5)(A)(iii). The term "damage" is defined by the CFAA as
Page 12
"any impairment to the integrity or availability of data, a program, a system, or information." **18 U.S.C. § 1030**(e)(8). The CFAA does not define "integrity," but the dictionary definition is "an unimpaired or unmarred condition: entire correspondence with an original condition: SOUNDNESS." Webster's Third New International Dictionary 1174 (1971). The use of the word "integrity" "contemplates, in [CFAA] context, some diminution in the completeness or useability of data or information on a computer system." Resdev, LLC v. Lot Builders Ass'n, No. 6:04-CV-1374ORL31DAB, 2005 WL 1924743, at *5 n. 3 (M.D. Fla. Aug. 10, 2005). Given these definitions of "damage" and "integrity," we reject Worldspan's argument that the mere "taking of information" constitutes "damage" under the CFAA.

   Orbitz correctly asserts that the complaint merely parrots the "causing damage" text of the CFAA in conclusory fashion and fails to allege any facts indicating that the completeness, useability, or availability of Worldspan's data was impaired. The conduct that is alleged is the mere "access" of Worldspan's computer system. One cannot draw the reasonable inference from this allegation that the integrity or availability of Worldspan's data was impaired, especially considering that the Amended Agreement authorized Orbitz to access the data in accordance with the contract terms. Accordingly, Worldspan's failure to adequately allege damage is an
Page 13
alternative ground for dismissal of the complaint. We need not reach Orbitz's remaining argument.

   We have dismissed the federal claim in this case. In this circuit, "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on their merits." Kennedy v. Schoenberg, Fisher & Newman, Ltd., **140 F.3d 716, 727** (7th Cir. 1998). We see no reason to continue to exercise supplemental jurisdiction, see **28 U.S.C. § 1367**(c); therefore, the state law claims are dismissed for lack of subject matter jurisdiction. (The dismissal is without prejudice to the refiling of the state-law claims in state court.)

### B. Worldspan's Motion to Transfer and Consolidate

   Around the same time Worldspan filed the instant complaint against Orbitz, Orbitz filed a complaint against Worldspan in the Circuit Court of Cook County. Worldspan removed that case to federal court; the case was assigned to Judge Bucklo and given case number 05 C 5972. Worldspan then filed a motion in the instant case to transfer 05 C 5972 to our docket and to consolidate that case with this proceeding. On April 3, 2006, Judge Bucklo granted Orbitz's motion to remand 05 C 5972 to the state court. Therefore, Worldspan's motion to transfer and consolidate will be denied as moot.
Page 14

## CONCLUSION

Defendant's motion to dismiss the complaint is granted. Plaintiff's motion to transfer and consolidate is denied as moot.

[fn1] According to Worldspan, Orbitz has publicly misrepresented that it can operate its direct-connect program and deliver the services historically provided by a CRS without the involvement of a CRS. In Worldspan's view, "Orbitz relies on CRS services for each and every airline segment booked through Orbitz, even where Orbitz characterizes them as `Direct Connect' segments." (Complaint ¶ 20.)

[fn2] The First Amendment defines an "Airline Non-Direct Connect Segment" as "each direct or through flight booked by means of the Orbitz Website that is not an Airline Direct Connect Segment." (Complaint, Ex. B, at 12.) An "Airline Direct Connect Segment" is defined as "each nonstop or direct airline flight booked by means of the Orbitz Website with an Airline Direct Connect customer using that carrier's internal airline reservation system and not using a CRS or global distribution system." (Id.)

[fn3] The CFAA defines a "protected computer" as, inter alia, a computer that is used in interstate or foreign commerce or communication. **18 U.S.C. § 1030**(e)(2).

Page 1

Copyright © 2007 Loislaw.com, Inc. All Rights Reserved