**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GARELLI WONG & ASSOCIATES, INC.,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀07 C 6227
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
WILLIAM M. NICHOLS,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀)

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
HIS MOTION TO DISMISS PURSUANT TO 12(b)(1) AND (6)**

Defendant has moved to dismiss Count III of Plaintiff's Complaint pursuant to Rule 12(b)(6), and to dismiss Counts I and II pursuant to Federal Rule of Civil Procedure 12(b)(1). Specifically, Defendant alleges that the Plaintiff has failed to allege (and cannot allege) facts sufficient to support its claim under the Computer Fraud and Abuse Act ("the Act") – Plaintiff's sole basis for attempting to maintain this state court breach of contract action between Illinois citizens in federal court.

In its reply, the Plaintiff fails to identify the precise basis for its purported civil action despite the requirement of 18 U.S.C. 1030(g) that a "civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)." In Defendant's motion to dismiss, Defendant observed that, "[w]hile Plaintiff does not specifically identify which clause of subsection (a)(5)(B) it purports to base its claims upon, Plaintiff appears to be attempting to invoke subsection (a)(5)(B)(i)...." (Motion at ¶ 3). Plaintiff does not take issue with this statement, but ignores its implications relating to the sufficiency of the allegations in Plaintiff's Complaint.

Subsection (a)(5)(B)(i) provides, in relevant part:

Whoever –

5(A)(i) knowingly causes the transmission of ... information ... and as a result of such conduct *intentionally causes damage* without authorization to, to a protected computer;

(ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, *recklessly causes damage*; or

(iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, *causes damage; and*

(B) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused ...

(i)     *loss* to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value."

(*Emphasis added*). *Id.* at 5(a) and 5(b)(i).

While Plaintiff maintains that either "damage or loss" is sufficient to maintain a civil action under the Act, a careful reading of the Act evidences that *both* damage and loss are required. Pursuant to Section (e)(8) of the Act, "damage" requires "impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. 1030(e)(8). The Act defines the term "loss" as "any reasonable *cost* to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred *because of interruption of service.*" (*Emphasis added*). 18 U.S.C. § 1030(e)(11). Since Plaintiff has not alleged, and cannot allege, that Defendant engaged in any activity that resulted in impairment to the integrity or availability of Plaintiff's data or any associated *cost* it has

2

incurred conducting a damage assessment, restoring data, or because of interruption of service, Plaintiff has failed to meet the requirements of the Act.

In opposing Defendant's motion, Plaintiff relies primarily upon this Court's decision in George S. May Intern. Co., v. Hostetler, 04 C 1606 (N.D. Ill. 5/28/04). In that case, the Defendant was alleged to have taken copyrighted documents, the nature of which were not specified in the Court's opinion. This court held that the requirement for "damage" was met because this Court could see "no principled reason ... why infringement of copyrighted material taken from a protected computer system would not qualify as impairment of the integrity of the copyrighted material." In the present case, however, the Plaintiff does not allege the nature of any "information" allegedly e-mailed by the Plaintiff, and certainly does not allege the information was copyrighted.

Additionally, in rendering its decision in George S. May Intern. Co., this Court relied primarily upon Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121 (W.D. Wash. 2000). That decision, however, was rendered before the word "and" was added at the end of 5(A)(iii) and the definition of "loss" was added to the Act, further clarifying the meaning of "damage" and "loss" under the Act. *See* Cenveo Corp. v. Celumsolutions Software GMBH & CO KG, Civil No. 06-4154 (Dist. Minn. 3/27/2007) p. 10-11 and n. 6 and ResDev, LLC v. Lot Builders Association, Inc., Case No. 6:04-cv-1374-Orl-31DAB (M.D.Fla. 8/10/05) p. 7-8 and n. 3 (copies attached hereto). *See also* Nexans Wires S.A. v. Sark-USA, Inc., 319 F. Supp.2d 468, 475, 478 (S.D.N.Y. 2004)(Observing that term the term loss "has consistently meant a cost of investigating or remedying damage to a computer, or a cost incurred because the computer's service was interrupted" and "revenue lost because the information was used

3

by the defendant to unfairly compete after extraction from a computer does not appear to be the type of 'loss' contemplated by the statute").

In any event, this Court's decision in <u>George S. May Intern. Co.</u> was rendered more than two years before the court's decision in <u>Worldspan v. Orbitz, LLC</u>, No. 05 C 5386 (N.D. Ill. 4/19/06) which rejected the argument that the mere "taking of information" constitutes "damage" under the Act.

This Court is urged to follow <u>Worldspan v. Orbitz, LLC</u>, 05 C 5386 (N.D. Ill. 4/19/06) in which the court held the actions of the Defendant insufficient to state a cause of action under the Act. By adopting the Act, Congress did not intent to transform virtually every state court claim for breach of contract, breach of a fiduciary duty, and misappropriation of trade secrets in which an isolated email may have been sent into a federal action.

For the reasons set forth herein and in Defendant's original motion, Defendant requests the Court to dismiss Count III of Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and to dismiss Counts I and II of Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1).

Dated: December 18, 2008

Respectfully Submitted,

/s Daniel P. Hogan
One of the Attorneys for the Defendant

Daniel P. Hogan
McCabe & Hogan P.C.
19 S. Bothwell, Suite 200
Palatine, IL 60067

Telephone:     847-359-6100
Facsimile:     847-359-6105
E-mail:        **dhogan@mccabehogan.com**

<u>CERTIFICATE OF SERVICE</u>

I, Daniel P. Hogan, an attorney, certify that service of Defendant's Reply Memorandum in Support of His Motion to Dismiss Pursuant to 12(b)(1) AND (6) on Plaintiffs' counsel was accomplished pursuant to ECF.

s/ Daniel P. Hogan
Daniel P. Hogan

## Loislaw Federal District Court Opinions

CENVEO CORP. v. CELUMSOLUTIONS SOFTWARE GMBH & CO KG (Minn. 3-27-2007)

Cenveo Corporation, Plaintiff, v. CelumSolutions Software GMBH & Co KG,

CelumSolutions Software GMBH, and Jeremy Wilker, Defendants.

Civil No. 06-4154 (PAM/AJB).

United States District Court, D. Minnesota.

March 27, 2007

### MEMORANDUM AND ORDER

PAUL MAGNUSON, District Judge

This matter is before the Court on Defendant Jeremy Wilker's Motion to Dismiss. For the reasons that follow, the Court grants in part and denies in part the Motion.

### BACKGROUND

Plaintiff Cenveo Corporation provides visual communication services, including customized digital asset management (DAM) services. (Am. Compl. ¶¶ 5-10.) DAM services provide a means to organize, store, and retrieve digital assets such as photographic images, logos, software, documents, design work, and videos. (Id. ¶ 45.) The business of providing DAM services is competitive and involves the development, use, and application of computer software programs to easily obtain, store, retrieve, and transfer digital information. (Id. ¶ 48.)

Defendant Jeremy Wilker was a Cenveo employee from 1996 to 2006. (Id. ¶ 28.) Before resigning in September 2006, Wilker was responsible for providing technical assistance with respect to DAM services and for developing ways to improve customer service in the DAM services market. (Id. ¶ 83-86.) During his employment, Wilker was
Page 2
informed of his obligation to comply with Cenveo's code of business conduct and ethics, which required Wilker to act with integrity in business transactions and avoid all conflicts of interest. (Id. ¶ 88.)

Defendant CelumSolutions competes with Cenveo in the DAM services market.[fn1] (Id. ¶¶ 18-19.) CelumSolutions allegedly solicited Wilker to provide confidential information about DAM services provided from Cenveo's Minneapolis office. (Id. ¶¶ 21-27.) Thereafter, Wilker allegedly provided CelumSolutions access to confidential computer systems, computer access codes, pricing information, and other proprietary information. (Id. ¶ 89.) He also allegedly provided CelumSolutions with proprietary information about the design, functionality, and working processes of DAM services programs. (Id.)

The Amended Complaint asserts twenty claims against Wilker. The

primary claims are: (1) breach of contract, (2) breach of duty of
confidentiality, (3) breach of duty of good faith and fair
dealing, (4) breach of duty of loyalty, (5) defamation, (6)
tortious contract interference, (7) tortious interference with
prospective economic advantage, (8) misappropriation of trade
secrets, (9) civil liability for theft, (10) negligence, and (11)
violation of the Computer Fraud and Abuse Act (CFAA),
**18 U.S.C. § 1030** et seq. The remaining claims are conspiracy claims based
on the primary claims.
Page 3

    Wilker seeks dismissal of all claims against him. He
substantively attacks only four claims: (1) breach of duty of
good faith and fair dealing, (2) violation of CFAA, (3)
negligence, and (4) defamation.**[fn2]** For the remaining claims, he
argues that Cenveo's pre-litigation tactics warrant dismissal.

**DISCUSSION**

**A. Standard of Review**

    For the purposes of a motion to dismiss under Federal Rule of
Civil Procedure **12**(b)(6), the Court takes all facts alleged in
the complaint as true. See Westcott v. Omaha, **901 F.2d 1486, 1488**
(8th Cir. 1990). The Court must construe the allegations in the
complaint and reasonable inferences arising from the complaint
favorably to the plaintiff and will grant a motion to dismiss
only if "it appears beyond doubt that the plaintiff can prove no
set of facts which would entitle him to relief." Morton v.
Becker, **793 F.2d 185**, 187 (8th Cir. 1986). (citations omitted).

**B. Breach of Duty of Good Faith and Fair Dealing**

    The Amended Complaint alleges that the employment agreement
between Cenveo and Wilker included a duty of good faith and fair
dealing, which prohibited Wilker from breaching Cenveo security
and business interests, required him to act in the best interests
of Cenveo during his employment, and forbade him from acting as
an agent for competitors.
Page 4
(Am. Compl. ¶¶ 203-05.) It further alleges that Wilker breached
that duty by accessing confidential computer systems, computer
access codes, and pricing information, and by providing
CelumSolutions with information about the design, functionality,
and working processes of software. (Id. ¶¶ 206-09.)

    "Minnesota does not recognize an implied duty of good faith and
fair dealing in employment contracts." Brozo v. Oracle Corp.,
**324 F.3d 661, 668** (8th Cir. 2003); Poff v. W. Nat'l Mut. Ins. Co.,
**13 F.3d 1189, 1191** (8th Cir. 1994) ("the Minnesota Supreme Court has
squarely held that there is no implied covenant of good faith and
fair dealing in Minnesota employment contracts") (citations
omitted). Cenveo argues that this rule only applies in the
context of at-will employment termination. However, both the
Minnesota Court of Appeals and the Eighth Circuit Court of
Appeals have refused to recognize the claim in contexts other
than termination. See Brozo, **324 F.3d at 668** (rejecting a claim
that the defendant acted in bad faith in refusing to pay sales
commissions); Lee v. Metro. Airport Comm'n, **428 N.W.2d 815, 822**

(Minn.Ct.App. 1988) (refusing to apply covenant of good faith
and fair dealing in a failure to promote case). Thus, the claim
fails as a matter of law.**[fn3]**
Page 5

### C. Defamation

The Amended Complaint alleges that Wilker communicated false
statements in the State of Minnesota to CelumSolutions
representatives and "other persons" knowing that the statements
would be communicated to customers seeking DAM services. (Am.
Compl. ¶¶ 173, 178, 222, 224.) The alleged statements include
that Cenveo was in extreme financial distress, that Cenveo would
probably be out of business during the coming year, that key
employees of Cenveo were leaving Cenveo to join CelumSolutions,
and that Cenveo should not be used to provide DAM services. (Am.
Compl. ¶¶ 178, 222-24.) Wilker argues that Cenveo failed to plead
the claim with sufficient particularity. He emphasizes that the
Amended Complaint does not specifically identify to whom Wilker
made the statements or where the statements were made.

To properly plead a claim for defamation, a plaintiff must
allege that "the defendant published a false statement of fact
that concerns the plaintiff and tends to harm the plaintiff's
reputation or to lower her in the estimation of the community."
D.W. v. Radisson Plaza Hotel Rochester, **958 F. Supp. 1368, 1381**
(D. Minn. 1997) (Magnuson, J.) (citations omitted). In addition,
"a claim for defamation must be pled with a certain degree of
specificity." Id. (citation omitted). "While it is not necessary
for the complaint to recite the exact language spoken, it is
necessary that the plaintiff identify who made the defamatory
statement and what was said." Id. (citation omitted).
Page 6

The Amended Complaint identifies Wilker as the person who made
the statements. It also alleges the content of his statements:
that Cenveo was in extreme financial distress, that it would
probably be out of business during the coming year, that key
employees were leaving Cenveo, and that Cenveo should not be used
to provide DAM services. Finally, it states that Wilker made the
statements to CelumSolutions representatives in the State of
Minnesota. These allegations sufficiently state a claim for
defamation.

Nonetheless, two of the statements cannot support a defamation
claim. First, the statement that Cenveo should not be used to
provide DAM services is non-actionable opinion. See Grillo v.
John Alden Life Ins. Co., **939 F. Supp. 685, 688** (D. Minn. 1996)
(Davis, J.) (citing Geraci v. Eckankar, **526 N.W2d 391, 397**
(Minn.Ct.App. 1995); Lund v. Chicago & Nw. Transp. Co.,
**467 N.W.2d 366, 368-69** (Minn.Ct.App. 1991)). Second, the statement that
Cenveo would probably be out of business during the coming year
is a statement about future events and therefore does not imply
the existence of a fact. See Schlieman v. Gannett Minn. Broad.,
Inc., **637 N.W.2d 297, 308** (Minn.Ct.App. 2001) ("Only statements
that present or imply the existence of fact that can be proven
true or false are actionable under state defamation law. Thus, if
it is plain that the speaker is expressing a subjective view, an
interpretation, a theory, conjecture, or surmise, rather than

claiming to be in possession of objectively verifiable facts, the statement is not actionable"). The Court therefore dismisses the portions of the defamation claim based on these non-actionable statements. However, the claim based on the statements of extreme financial distress and the departure of key employees remains.
Page 7

### D. Negligence

The Amended Complaint alleges that Wilker had a duty to exercise reasonable care to maintain the confidentiality of proprietary information, to represent the best interests of Cenveo, and to refrain from causing harm to Cenveo through statements and information provided to competitors and others. (Am. Compl. ¶ 255.) It further alleges that Wilker breached those duties when he allowed information to be disclosed to CelumSolutions. (Id. ¶ 256.)

Wilker argues that Minnesota law does not recognize a negligence claim by an employer against an employee. Decisions from the Minnesota Supreme Court indicate otherwise. See Schneider v. Buckman, **433 N.W.2d 98, 102** (Minn. 1988) ("it is . . . well settled that an employer is entitled to recover from the employee damages which the employer was compelled to pay because of the employee's negligence"); Capitola v. Minneapolis, S.P. & S.S.M.R. Co., **103 N.W.2d 867, 869** (Minn. 1960) (recognizing that an employer may sue an employee for damages arising from the employee's negligence and holding that contributory negligence is a defense); Miller v. Simons, **59 N.W.2d 837, 840** (Minn. 1953) (indicating that an employer may succeed in a negligence claim against an employee). Nonetheless, Wilker argues that Minn. Stat. § **181.970**, which was enacted in 1993, statutorily overrules these decisions. That provision requires an employer to defend and indemnify its employee for civil damages claimed against the employee when the employee was acting in the performance of his duties, unless the employee was guilty of "intentional misconduct, willful neglect of the duties of the employee's position, or bad
Page 8
faith." Minn. Stat. § **181.970**(1).

The plain language of § 181.970 imposes a statutory duty on an employer to defend and indemnify an employee for damages arising from the negligent performance of employment duties. The imposition of that duty effectively precludes a negligence action against an employee. To hold otherwise renders a circular result: An employer would have to defend and indemnify an employee for losses the employer seeks from the employee. Because such a construction is absurd, the Court finds that § 181.970 precludes a claim by an employer against an employee for the negligent performance of employment duties.**[fn4]**

Cenveo argues that § 181.970 is inapplicable because it applies only to third-party claims against an employee. However, the provision contains no such limitation. Moreover, the provision contains other exceptions, which suggest that if the legislature intended to make further limitations — such as that the provision does not apply to employer-employee claims — the legislature would have so provided. See Minn. Stat. § **645.19**

(exceptions within a statute are construed as excluding additional exceptions); see also Indep. Sch. Dist. No. 404 v. Castor, **670 N.W.2d 758**, **762** (Minn.Ct.App. 2003) (rejecting argument that a similar provision, which required a municipality to defend and indemnify its employees for damages
**Page 9**
arising from the performance of employment duties, applied only to third-party claims).

The Court emphasizes that § 181.970 does not foreclose all tort actions against employees by employers because the provision does not require employers to defend and indemnify for actions involving "intentional misconduct, willful neglect of the duties of the employee's position, or bad faith." However, the Amended Complaint does not claim that Wilker committed such acts. To the contrary the Amended Complaint expressly alleges that Wilker "was negligent in the performance of his duties and his breach of those duties" damaged Cenveo. (Am. Compl. ¶ 256.) Because the effect of § 181.970 precludes a claim against an employee for the negligent performance of employment duties, the negligence claim fails as a matter of law.

### E. CFAA

The Amended Complaint alleges that Wilker wrongfully and intentionally accessed Cenveo's computer system to obtain confidential information and computer programs and software. (Am. Compl. ¶¶ 260-62.) It further asserts that Wilker provided CelumSolutions unauthorized access to Cenveo's computer system, which allowed CelumSolutions to wrongfully access Cenveo's proprietary information and fraudulently obtain computer programs and software. (Id. at 111-27.) Finally, it asserts that Wilker's unauthorized access to Cenveo's computer system damaged Cenveo by more than $75,000. (Id. ¶ 262.)

Wilker advances two arguments in favor of dismissal. First, he argues that any claim based on alleged violations of **18 U.S.C. §§ 1030**(a)(4) and **1030**(a)(6) must fail because
**Page 10**
those provisions create criminal — not civil — liability.**[fn5]** A party cannot bring a civil action based on provisions other than § 1030(a)(5). McLean v. Mortg. One & Fin. Corp., No. 04-1158, 2004 WL 898440, *2 (D. Minn. Apr. 9, 2004) (Magnuson, J.). Accordingly, any claim based on violations of § 1030(a)(4) and § 1030(a)(6) fails as a matter of law.

Second, Wilker argues that Cenveo has not pled damage or loss as contemplated by the CFAA. To establish a CFAA claim, Cenveo must show that Wilker intentionally accessed a protected computer without authorization and, as a result, caused an annual loss of at least $5,000. **18 U.S.C. § 1030**(g); **18 U.S.C. § 1030**(a)(5)(A)(i)-(iii); **18 U.S.C. § 1030**(a)(5)(B)(i). The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to the offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."
**18 U.S.C. § 1030**(e)(11) (emphasis added); see also Nexans Wires S.A. v.

Sark-USA, Inc., 319 F. Supp. 2d 468, 477-78 (S.D.N.Y. 2004)
(because § 1030(e)(11) limits "loss" to costs incurred because of
interruption of service, loss of business due to defendant's use
of proprietary information was not covered by the CFAA); ResDev,
LLC v. Lot Builders Ass'n, Inc., No. 6:04-CV-1374,
2005 WL 1924743 *2-*5
Page 11
(M.D. Fla. Aug. 10, 2005) (rejecting the argument that "loss"
can cover a trade secret's exclusivity value).[fn6]

   The Amended Complaint alleges that Wilker damaged Cenveo by
wrongfully and intentionally accessing its computer system.
Notably, however, the Amended Complaint is devoid of allegations
that Wilker's access caused an interruption in service or that
Cenveo incurred costs associated with responding and conducting
damage assessment. As such, the Amended Complaint fails to
adequately plead "loss" as defined by the CFAA. Consequently, the
claim fails as a matter of law.

**E. Remaining Claims**

   The Amended Complaint asserts several other claims against
Wilker. Wilker does not contend that these claims are
insufficiently pled or fail as a matter of law. Instead, he
relies on many factual assertions and documentary evidence that
are outside the Amended
Page 12
Complaint. For example, he submits that his contacts with
CelumSolutions were for the purpose of developing a joint venture
with CelumSolutions and that the contacts were part of his duties
for Cenveo. In addition, he maintains that the Court should
dismiss the claims because Cenveo engaged in vexatious
pre-litigation tactics. Because Wilker is asking the Court to go
well beyond the allegations of the Amended Complaint, the Court
denies the Motion as it relates to these claims. See Peck v.
Hoff, 660 F.2d 371, 374 (8th Cir. 1981) (because a motion to
dismiss does not question the facts supporting a claim, a court
need not admit matters outside the pleadings).

**CONCLUSION**

   Minnesota law does not recognize an implied covenant of good
faith and fair dealing in employment contracts. It also does not
recognize defamation claims based on opinion and prediction.
Likewise, Minn. Stat. § 181.970 precludes an action by an
employer against an employee for the negligent performance of
duties. Finally, the Amended Complaint fails to adequately plead
"loss" as defined by the CFAA. Accordingly, **IT IS HEREBY ORDERED**
that:

   1. Defendant Jeremy Wilker's Motion to Dismiss (Docket
   No. 13) is **GRANTED in part** and **DENIED in part**; and

   2. Counts III, X, and XI of the Amended Complaint are
   **DISMISSED with prejudice.**

[fn1] Defendant CelumSolutions Software GMBH & Co KG is a limited
partnership established under Austrian law. Defendant
CelumSolutions Software GMBH is a limited liability company
incorporated under Austrian law. (Am. Compl. ¶¶ 11-13.) On

December 28, 2006, the Court issued Letters Rogatory to serve
these Defendants. To date, neither has responded to the Amended
Complaint. Throughout this Memorandum and Order, the Court
collectively refers to these entities as CelumSolutions.

[fn2] Wilker initially argued that the breach of contract claim also
failed as a matter of law, but withdrew his motion as it related
to that claim at the oral argument hearing. The Court therefore
does not address the merits of that claim.

[fn3] "Although the Minnesota courts will not imply a covenant of
good faith and fair dealing in employment contracts, recent cases
recognize that there can be an express covenant to this effect."
Poff, **13 F.3d at 1191.** General policy statements do not create an
express covenant. Id. Rather, to create an express covenant
"there must be specific and definite terms that meet the
contractual requirements of an enforceable unilateral offer." Id.
Whether an employer extends a unilateral offer is a question of
law. Martens v. Minn. Mining & Mfg. Co., **616 N.W.2d 732, 740**
(Minn. 2000). To constitute an offer for a unilateral contract,
an employer's statement must be sufficiently definite to allow a
"court to discern with specificity what the provision requires of
the employer so that if the employer's conduct in . . .
making . . . decisions affecting the employment is challenged, it
can be determined if there has been a breach." Id. at 742. The
Amended Complaint fails to set forth any specific terms to
establish a unilateral offer. Thus, the claim fails insofar as it
is based on an express covenant.

[fn4] The Court acknowledges that another court has allowed a
negligence claim to proceed despite the enactment of § 181.970.
See Carlsen v. Experience Works, No. 04-2676, 2004 WL 234406, at
*7-*8 (D. Minn. Feb. 4, 2004) (Tunheim, J.) (rejecting the
argument that employees cannot be held liable to employers for
losses resulting from the employee's negligence) (citation
omitted); see also Carlsen v. Experience Works, Inc., No.
04-2676, 2005 WL 388600, at *2 (D. Minn. Feb. 11, 2005) (Tunheim,
J.) (reaffirming denial of summary judgment on the applicability
of § 181.970 in a negligence claim brought by an employer against
an employee). However, the Carlsen decisions addressed whether
the employee acted in bad faith and are therefore
distinguishable.

[fn5] Section 1030(a)(4) creates criminal liability for persons who
"knowingly and with intent to defraud accesses a protected
computer without authorization, or exceeds authorized access, and
by means of such conduct furthers the intended fraud and obtains
anything of value." **18 U.S.C. § 1030**(a)(4). Section 1030(a)(6)
provides that a person is criminally liable if he "knowingly and
with intent to defraud traffics in any password or similar
information through which a computer may be accessed without
authorization, if . . . such trafficking affects interstate
commerce." **18 U.S.C. § 1030**(a)(6).

[fn6] Courts disagree on the definition of "loss" and some hold that

it is sufficient to plead unauthorized access and use of proprietary information. See, e.g., Sw. Airlines Co. v. Farechase, Inc., 318 F. Supp. 2d 435, 439 (N.D. Tex. 2004) (complaint that alleged loss of at least $5,000 sufficiently pled CFAA claim); H & R Block E. Enter., Inc. v. J & M Secs., LLC, No. 05-1056, 2006 WL 1128744, at *4 (W.D. Mo. Apr. 24, 2006) (allegations that the defendant's "unlawful and unauthorized access and use of . . . confidential customer information" caused the plaintiff to suffer at least $5,000 in damages, including response costs, was sufficient to survive motion to dismiss); HUB Group, Inc. v. Clancy, No. 05-2046, 2006 WL 208684, at *3-*4 (E.D. Pa. Jan. 25, 2006) (allegations that the integrity of the plaintiff's computer database was damaged through the defendant's unauthorized access to confidential information constituted damages under CFAA). The Court disagrees with these decisions, as they ignore the plain definition of "loss" provided in § 1030(e)(11), which requires damages caused by an interruption of service. Similarly, EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 585 (1st Cir. 2001) and Shurgard Storage Centers v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1127 (W.D. Wash. 2000) are inapposite because they rely on a previous version of the CFAA that did not define "loss."

Copyright © 2007 Loislaw.com, Inc. All Rights Reserved

## Loislaw Federal District Court Opinions

RESDEV, LLC v. LOT BUILDERS ASSOCIATION, INC., (M.D.Fla. 2005)

RESDEV, LLC, Plaintiff, v. LOT BUILDERS ASSOCIATION, INC., MICHAEL SHANNON

BOSWELL & BRAD LUKENS, Defendants.

Case No. 6:04-cv-1374-Orl-31DAB.

United States District Court, M.D. Florida,

Orlando Division.

August 10, 2005

### ORDER

GREGORY A. PRESNELL, District Judge

This case is before the Court on Defendants Lot Builders Association Inc.'s, Michael Boswell's, and Brad Luken's (collectively, "Lot Builders") Motion for Summary Judgment (Doc. 52), Plaintiff ResDev LLC's Cross Motion for Summary Judgment (Doc. 53), and Resdev's and Lot Builder's respective Oppositions (Docs. 73 and 71).

### I. BACKGROUND

ResDev has sued Lot Builders for violation of the Computer Fraud and Abuse Act, **18 U.S.C. § 1030** ("CFAA"), on ground that Lot Builders absconded with ResDev's "scattered-lots database," a computerized resource on available residential lots.**[fn1]** Lot Builder's principals, two former ResDev employees, acknowledge that, after leaving ResDev's employ, they visited its website and were able to access information that was not password protected. Based on that event and others, ResDev claims that Lot Builders committed unauthorized computer access in violation of the CFAA, and ResDev seeks to recover, *inter alia*, damages based on the information's alleged trade secret value. Lot Builders asserts, in response, that ResDev has not suffered cognizable loss.
Page 2

### II. STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Whether a fact is material depends on the substantive law of the case. *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 248** (1986). If there is an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof, that party must "go beyond the pleadings and by . . . . affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex Corp. v. Catrett,* **477 U.S. 317,**
**324-25** (1986) (internal quotations and citation omitted). Summary
judgment is mandated against the nonmoving party who thereafter
fails to present sufficient evidence to establish a genuine issue
of fact for trial. *Id.* at 322, 324-25.

In this review, the Court must consider all inferences drawn
from the underlying facts in a light most favorable to the
nonmoving party, and resolve all reasonable doubts against the
moving party. *Anderson,* **477 U.S. at 255.** If a material issue of
fact exists, the court must not decide it, but rather, must deny
summary judgment and proceed to trial. *Environmental Def. Fund
v. Marsh,* **651 F.2d 983,** **991** (5th Cir. 1981).**[fn2]** But "there
is no issue for trial unless there is sufficient evidence
favoring the nonmoving party for a jury to return a verdict for
that party. If the evidence is merely colorable, or is not
significantly probative, summary judgment may be granted."
*Anderson,* **477 U.S. at 249-50** (citations omitted).
Page 3

III. LEGAL ANALYSIS

This case turns primarily on statutory construction. In that
regard, there are certain basic rules this Court must follow.

There is a presumption that, in drafting a statute, Congress
said what it meant and meant what it said. *American Bankers Ins.
Group v. United States,* **408 F.3d 1328,** **1332** (11th Cir. 2005).
Indeed, "[t]he first rule in statutory construction is to
determine whether the language at issue has a plain and
unambiguous meaning with regard to the particular dispute."
*Shotz v. City of Plantation, Florida,* **344 F.3d 1161,** **1167** (11th
Cir. 2003). Words carry their ordinary meaning, unless otherwise
defined. *American Bankers,* **408 F.3d at 1332.** If Congress has
used clear statutory language, a court need not consider
extrinsic materials, such as legislative history, and certainly
should not derive from such materials a meaning that is
inconsistent with the statute's plain meaning. *Shotz,*
**344 F.3d at 1167.** The only exception is this narrow one: "courts my reach
results inconsistent with the plain meaning of a statute `if
giving the words of a statute their plain and ordinary meaning
produces a result that is not just unwise but is clearly
absurd.'" *CBS Inc. v. PrimeTime 24 Joint Venture,*
**245 F.3d 1217,** **1228** (11th Cir. 2001) (citation omitted).

Even where Congress has used statutory language that is not
entirely transparent, courts are to resort, in the first
instance, to canons of construction — time-tested interpretive
rules developed to determine the meaning of individual statutory
terms from a methodical inquiry into their broader, statutory
context. *Id.* at 1225. In construing a statute's meaning and
application to a particular case, a court should resort to
extrinsic materials, such as legislative history, only if the
statutory language either produces a clearly absurd result or
presents a substantial ambiguity. *See Shotz,* **344 F.3d at 1367;**
*CBS Inc.,* **245 F.3d at 1225.**
Page 4

A. Relevant Excerpts of the CFAA's Statutory Text

**(a)** Whoever —

. . .

**(5) (A) (i)** knowingly causes the transmission of . . . information . . . and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

**(ii)** intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

**(iii)** intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; and

**(B)** by [such] conduct described in . . . subparagraph (A) caused . . . —

**(i)** <u>loss</u> to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value;

**(ii)** the modification or impairment, or potential modification or impairment of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

**(iii)** physical injury to any person;

**(iv)** a threat to public health or safety; or

**(v)** damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security.

. . .

shall be [subject to criminal penalties].

**(e)** As used in this section —

. . .

**(8)** the term "<u>damage</u>" means any impairment to the integrity or availability of data, a program, a system, or information;

. . .

**(11)** the term "<u>loss</u>" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service;

. . .

**(g)** Any person who suffers <u>damage</u> or <u>loss</u> by
reason of a violation of this section may maintain a
civil action against the violator to obtain
compensatory damages and injunctive relief or other
equitable relief. A civil action for a violation of
this section may be brought only if the conduct
involves 1 of the factors set forth in clause (i),
(ii), (iii), (iv) or (v) of subsection (a)(5)(B).
Damages for a violation involving only conduct
described in subsection (a)(5)(B)(i) are limited to
economic damages. * * * No action may be brought
under this subsection for the negligent design or
manufacture of computer hardware, computer software,
or firmware.
Page 5

**18 U.S.C. § 1030** (emphasis added).

**B. Construction of the CFAA's Relevant Statutory Text**

At the outset, subsection (g) cites two explicitly-defined
injuries — "damage" or "loss" — either of which a plaintiff must
suffer, as a result of a CFAA violation, in order to maintain a
cause of action for "compensatory damages." *Id.* (g). A further
precondition is that the alleged violation involve one of five
enumerated factors. *Id.* For example, if a hospital patient
suffers "damage" — an "impairment to the . . . availability of . . .
information" — by reason of a CFAA violation, the patient may
maintain a civil action against the violator for compensatory
damages, if the violation also involved "impairment . . . of
care" or "physical injury." *Id.* (g), (e)(8),
(a)(5)(B)(ii)-(iii)(g). In this regard, the CFAA's private cause
of action is principally defined by a two-part injury
requirement; a plaintiff must suffer a certain type of root
injury, which is not sufficient to support a civil action, unless
one of five operatively-substantial effects occurs. *Id.*
(a)(5)(B)(i)-(v), (g).

A plaintiff who has suffered injuries fitting subsection (g)'s
two-part injury requirement may, in turn, obtain "compensatory
damages and injunctive relief or other equitable relief." *Id.*
(g). In ordinary legal parlance, "compensatory damages" are
"[d]amages sufficient in amount to indemnify the injured person
for the loss suffered." BLACK'S LAW DICTIONARY 416 (8th ed.
2004). And in ordinary practice, "compensatory damages are not
restricted to actual loss of time or money; they cover both
mental and physical aspects of injury — tangible and intangible."
ELEVENTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL CASES), Federal
Claims Instruction 1.2.1 (1999). Subsection (g), however, further
limits the available damages to "economic damages," if a
violation involved only conduct which caused "loss" aggregating
at least $5,000 in a 1-year period. *Id.* So it is fairly clear
that, for conduct which results only in "loss," the only
available measure of
Page 6
damages is actual monetary loss. **18 U.S.C. § 1030**(g). Thus,
besides requiring "damage" or "loss," subsection (g)'s
terminology provides two additional limits in regard to damages —

damages must be "compensatory" and, for "loss," can only be "economic." *Id.*

### 1. ResDev's Principal Position

   In the instant case, ResDev claims, as its greatest loss, an amount equal to Lot Builders' revenues, about $175,000, which ResDev sees as resulting from Lot Builder's unauthorized obtainment of ResDev's scattered-lots database. ResDev also acknowledges that the viability of its civil action hinges on subsection (a)(5)(B)(i). ResDev, therefore, assumes that Lot Builder's allegedly ill-gotten revenues qualify as "loss" aggregating over $5,000 in a 1-year period. *See id.* (a)(5)(B)(i). ResDev's position, however, does not fit the CFAA's meaning of "loss."

   The CFAA defines "loss" in terms of "any reasonable cost." *Id.* (e)(11). "Cost" ordinarily means an "amount paid or charged for something; price or expenditure." BLACK'S LAW DICTIONARY 371 (8th Ed. 2004). The CFAA's "loss" definition goes on to list costs that are similar in that they are all directly associated with, or with addressing, an unauthorized-computer-access event. Among those costs are: "any revenue lost, cost incurred, or other consequential damages incurred *because of interruption of service.*" **18 U.S.C. § 1030**(e)(11) (emphasis added). By use of the term "cost" and its listing potential injuries directly associated with, or with addressing, an unauthorized-computer-access event, the CFAA plainly enumerates a narrow grouping of "loss" distinct from — and thus excluding — the far greater range of losses that could flow from a violation of the CFAA. ResDev's position, that "loss" can cover a trade secret's exclusivity value, disregards the ordinary meaning of statutory terms, fails to account for surrounding context, and runs counter to the "*expression unius . . .*" canon of construction, which

Page 7

translates as "the expression of one implies the exclusion of others." *See Barnhart v. Peabody Coal Co.,* **537 U.S. 149, 168** (2003) (indicating that *expressio unius* cannon has force "when the items expressed are members of an `associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence.").

   Futhermore, to the extent ResDev asserts that sufficient "damage" or "loss" can open the door to a broader class of damages, ResDev's position both ignores subsection (g)'s wording: "[a]ny person <u>who suffers damage or loss</u> by reason of a violation of this section may maintain a civil action against the violator to obtain <u>compensatory damages,</u>" **18 U.S.C. § 1030**(g) (emphasis added); and also ignores the selection of factors listed in subsection (a)(5)(B). Each of the explicitly-defined root injuries — "damage" or "loss" — is an immanently foreseeable effect of unauthorized computer access, and subsection (a)(5)(B)'s five-factor list includes things which clearly may result from "damage" or otherwise constitute "loss." ResDev's position fails to acknowledge that allegedly ill-gotten revenues from a trade secret are neither a "but-for" nor a proximate consequence of "damage," and nor do they fit within the grouping of "loss." In that regard, ResDev's position conflicts with the CFAA's language, where the *sine qua non* of the private cause of

action — either of two explicitly-defined root injuries — narrows
the available "damages" to "compensatory damages" — those damages
which result from, or constitute, an explicit type of injury.

    Although ResDev cites two cases that appear to support its
position, neither is helpful. In *Shurgard Storage Centers, Inc.
v. Safeguard Self Storage, Inc.,* **119 F.Supp.2d 1121** (W.D. Wash.
2000), the district court considered a version of the CFAA
predating its most recent version. On or after October 26, 2001,
Congress amended the CFAA, in relevant part, by defining the term
**Page 8**
"loss" in subsection (e)(11). *See* USA Patriot Act of 2001,
Pub.L. No. **107-56**, § 814(d)(5). That rendered subsection (g)'s
reference to "damage" and "loss" a reference to two defined
terms, which was not previously the case. *See* **18 U.S.C. § 1030**
(1996). Whereas ResDev's principal alleged loss — trade secret
value — may have been considered an actionable loss under the
CFAA's previous version, its current version precludes that
interpretation.**[fn3]**

    As to the second case, it is unfortunate that in *Four Seasons
Hotels & Resorts B.V. v. Consorcio Barr, S.A.,* the court failed
to analyze the effect of the CFAA's 2001 amendments and relied on
both *Shurgard* and another case dealing with an earlier version
of the statute. *See Four Seasons Hotels,* 267 F. Supp. 2d 1268,
1322 (S.D. Fla. 2003) (otherwise relying on *EF Culture Travel,
B.V. v. Explorica, Inc.,* **274 F.3d 577**, **585** (1st Cir. 2001),
which defined "loss" as "detriment, disadvantage, or deprivation
from failure to keep, have or get.").**[fn4]** In the end,
however, it is Congress' words and definitions that generally
control statutory meaning. *See American Bankers,*
**408 F.3d at 1332**. The CFAA's amendment and current language were not
meaningfully
**Page 9**
analyzed, nor perhaps even flagged as a concern, in *Four Seasons
Hotels,* and the absence of meaningful analysis renders that case
unpersuasive.

## 2. ResDev's Secondary Position

    In its Opposition (Doc. 73), ResDev claims, as a fallback, that
it has incurred loss by having to undertake extensive and costly
efforts in response to Lot Builder's unauthorized computer
access. It is undisputed that Lot Builder's principals no longer
work at ResDev's place of business. Accordingly, remote access is
the ongoing threat that apparently causes ResDev
concern.**[fn5]** As an indication of the threat's magnitude,
ResDev points out that one of Lot Builder's principals helped
design ResDev's computer system, knows "the type of security he
placed on the computers at ResDev, how the security was set up,
how many levels of security were in place and where the
vulnerabilities in ResDev's security existed." Based on the view
that its computers "will never be truly secure" until it sets up
"a new security framework," ResDev estimates that the ultimate
cost of responding to the threat will probably exceed $150,000,
exclusive of interim cost for security evaluation and
implementation.

    Whether by strategy or a lack of notice, Lot Builders has not

clearly addressed ResDev's cost-of-response estimates. Lot
Builders has indicated, however, that the extent of its remote
access has been one or more visits to ResDev's website; that,
each time, the visit to the website occurred under attorney
supervision; and that the purpose of the visits was to show how
ResDev's website is not adequately secured. Lot Builders,
therefore, may have challenged (albeit vaguely) whether its
conduct could give rise to cognizable loss.
Page 10

   In that regard, the CFAA provides potential redress for "loss,"
which includes "any reasonable cost" of responding to a
violation. **18 U.S.C. § 1030**(e)(11), (g). To enable a cause of
action, however, the "loss" from a violation must aggregate at
least $5,000 to 1 or more persons in a 1-year period. *Id.*
(a)(5)(B)(i), (g). The CFAA, in addition, explicitly rejects any
notion that it provides a cause of action for negligent computer
hardware or software design. *Id.* (g).

   Based on the current state of the record, the Court cannot say
that either party has revealed the absence of a material issue of
fact. Yet it is evident that, at least insofar as ResDev seeks to
recoup the cost of building a new computer system with far
greater security, the reasonableness of ResDev's alleged "loss"
will be an issue. The parties, however, simply have not presented
the issue in a manner in which this Court could reasonably
consider it. Nevertheless, as the threshold viability of ResDev's
cause of action depends on a minimum amount of "loss," the Court
will consider, if filed by September 12, 2005, further pre-trial
motions on that issue, even though the dispositive-motion's
deadline has passed.

   **IV. CONCLUSION**

   For the foregoing reasons, it is therefore

   **ORDERED** that Lot Builder's Motion for Summary Judgment (Doc.
52) is GRANTED in part and DENIED in part; ResDev's Motion for
Summary Judgment (Doc. 53) is DENIED; and ResDev's claim is
dismissed to the extent it seeks compensatory damages for alleged
injuries that do not constitute "loss" within the meaning of the
CFAA.

   **DONE** and **ORDERED.**

[fn1] ResDev has also sued Lot Builders in state court on various
unfair-competition claims.


[fn2] Unless reversed, decisions of the Fifth Circuit prior to
October 1, 1981 are binding precedent on this Court. *Bonner v.
City of Prichard,* **661 F.2d 1206, 1209** (11th Cir. 1981) (en
banc).


[fn3] Another thing that detracts from *Shurgard* is its heavy
reliance on legislative history. *Id.* at 1126-29. For instance,
based on legislative history, *Shurgard* adopted an unusual and
extraordinary interpretation of the word "integrity" within the
CFAA's definition of "damage" — *i.e.,* "any impairment to the

integrity or availability of data . . . or information." It found
"integrity" to contemplate the loss of a trade secret's
exclusivity value. *Id.* at 1126-27. "Integrity," however,
ordinarily means "wholeness" or "soundness," OXFORD ENGLISH
REFERENCE DICTIONARY 731 (Rev. 2nd ed. 2002), and contemplates,
in this context, some diminution in the completeness or use
ability of data or information on a computer system. This Court
finds no meaningful ambiguity that might weigh in favor of
relying on legislative history, especially when it predates the
CFAA's more recent amendments. And, whether real or apparent,
there appears to have been a recent up-tick in cases looking ill
upon such analyses. *See e.g., Exxon Mobil Corp. v. Allapattah
Servs. Inc.,* **125 S.Ct. 2611, 2626** (2005) (favorably mentioning
the view that legislative-history analyses are akin to "looking
over a crowd and picking out your friends.").


[fn4] In an unpublish, non-precedential opinion, the Eleventh
Circuit affirmed the district court's liability determination
without discussion.


[fn5] The Court finds utterly meritless ResDev's suggestion that
a CFAA violation occurs every time Lot Builders accesses its own
computers and allegedly looks at information belonging to Resdev.
Such access, if it can be called that, is conduct from which
ResDev could not, as a matter of law, reasonably suffer "damage"
or "loss" within the CFAA's meaning.

**Page 1**



Copyright © 2007 Loislaw.com, Inc. All Rights Reserved